Filed 11/22/22  P. v. Negron CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B322510 |
| Plaintiff and Respondent, | (Kern County Super. Ct. No. DF013159A) |
| v. | |
| JOSE NEGRON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Kern County, John R. Brownlee, Judge.  Affirmed in part, vacated in part, and remanded with directions.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant

Attorney General, Eric L. Christoffersen, Sally Espinoza, and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

---

In a single-count information filed by the Kern County District Attorney's Office, defendant and appellant Jose Negron, also known as Joe Tomasello,[1] was charged with battery by a prisoner on a nonconfined person (Pen. Code, § 4501.5),[2] in the commission of which he personally inflicted great bodily injury (§ 12022.7). It was further alleged that defendant had five out-of-state convictions, which qualified as serious felonies within the meaning of the "Three Strikes" law (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e)) and section 667, subdivision (a), and that he had served two prior prison terms (§ 667.5, subd. (b)).

Defendant represented himself at trial. The jury found him guilty of the charged offense and found true the great-bodily-injury allegation. The jury also found true all prior conviction allegations.[3] The trial court sentenced defendant to a total term of 27 years to life in prison, plus a determinate term of 23 years.

---

[1] According to defendant, Jose Negron is an alias and his real name is Joe Tomasello. Both names appear throughout the record.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] At the request of the People, the trial court had previously dismissed the two prior prison term allegations.

2

In this timely appeal, defendant contends that (1) the trial court committed multiple reversible errors with respect to defendant's competency to stand trial and to represent himself, and (2) the trial court erred in ruling that defendant's out-of-state convictions qualified as serious felonies under California law.

The People concede—and we agree—that the evidence was insufficient to prove that any of the out-of-state convictions was a serious felony for the purpose of the Three Strikes law or the section 667, subdivision (a) enhancement.  Accordingly, we reverse the true findings on those prior conviction allegations, vacate defendant's sentence, and remand the matter to the trial court, where the People may retry the prior conviction allegations.

We otherwise affirm the judgment.

## FACTS[4]

On June 23, 2017, Correctional Officer Richard Juan entered defendant's prison cell at Wasco State Prison to deliver legal mail.  As Officer Juan bent over to have defendant, who was seated in his wheelchair, sign for the mail, defendant hit Officer Juan twice in the face.  Officer Juan suffered a fractured nose, for which he underwent surgery.

## DISCUSSION

I. *Competency to Stand Trial and for Self-Representation*

Defendant raises three arguments related to his competency to stand trial and to represent himself.  He contends

---

[4]     Because defendant does not challenge the sufficiency of the evidence underlying his conviction for the charged offense— battery by a prisoner on a nonconfined person—and the great-bodily-injury enhancement, we provide only a brief summary of the facts adduced at trial.

3

that the trial court erred by (1) failing to suspend proceedings and conduct a new competency hearing after learning that defendant was no longer taking medication and was displaying bizarre behavior; (2) allowing defendant to represent himself at a hearing on July 8, 2019, after the prosecutor raised a doubt as to defendant's competence; and (3) permitting defendant to represent himself at trial.

A. <u>Background</u>

1. *Doubt as to defendant's competency*

At a pre-preliminary hearing on December 6, 2017, defendant petitioned to represent himself. During the ensuing colloquy, defendant claimed that he had previously represented himself when Google Earth attempted to prosecute him. He stated that Google Earth was watching and listening to him and that people were "trying to pin [him] with stuff." Defendant was taking medication for psychological reasons.

The trial court declared a doubt as to defendant's competency, suspended criminal proceedings, and appointed two mental health professionals to evaluate defendant.

2. *Competency evaluations*

Two psychologists—Dr. Musacco and Dr. Haddock— evaluated defendant.

i. <u>Dr. Musacco's evaluation</u>

"Defendant described a variety of delusional beliefs" to Dr. Musacco. For example, defendant stated that former First Lady Michelle Obama was transgender and that she was involved in a homosexual relationship with former President Barack Obama. The Obamas were monitoring him and had placed a camera in his jail cell. They were following defendant to "prevent him from exposing their well-kept secrets." Then-

4

President Donald Trump had promised to help defendant. Defendant also claimed to be an internationally renowned DJ.

Dr. Musacco found that defendant had "a serious mental illness which substantially impact[ed] his reality contact" and "an impaired understanding of his potential penalties . . . ." Dr. Musacco opined that defendant was "incapable of representing himself in a rational and effective manner."

ii. Dr. Haddock's evaluation

Defendant also made claims regarding the Obamas to Dr. Haddock. He stated that Michelle Obama was a "'transvestite'" and a drug dealer; President Obama had been a police officer in Chicago and had arrested defendant. Defendant accused his mother of being "'evil'" and "'waiting for [him] to die so she c[ould] sue the State of California.'" He admitted to obsessive thoughts concerning being followed and watched.

Dr. Haddock opined that defendant was incompetent to stand trial and to represent himself.

3. *Incompetency to stand trial*

On January 3, 2018, after considering the psychological evaluations, the trial court found that defendant was not presently competent to stand trial and referred him to Kern Behavioral Health and Recovery Services for recommendation and evaluation.

4. *Commitment to state hospital*

In late January 2018, the trial court committed defendant to the State Department of Mental Health. The court ordered defendant to be housed at Atascadero State Hospital (Atascadero) for appropriate treatment and confinement.

5

### 5. *Involuntary administration of medication*

A psychologist at Atascadero evaluated defendant on November 7, 2018. During the evaluation, defendant "express[ed] delusional statements about Obama and FBI monitoring him through cameras[.]" (Italics omitted.) He "expressed clear paranoia and persecutory delusional beliefs about the criminal justice system[.]" (Italics omitted.) Defendant stated that he did not want to be represented by a public defender and maintained that he wanted to represent himself. The psychologist opined that defendant "would likely be extremely ineffective in court, as he relies upon delusional or misunderstood 'evidence' when discussing his case, is unable to remain calm while describing his legal situation, and is often unable to appropriately stay on topic." (Italics omitted.)

On December 10, 2018, the Department of State Hospitals petitioned for an order to compel the involuntary treatment of defendant with antipsychotic medication. The hearing on the petition was held on December 19, 2018.

At the hearing, Dr. Elwyn, defendant's treating psychiatrist at Atascadero, explained that defendant suffered from schizophrenia, the symptoms of which include hallucinations, delusions, paranoia, and disorganization. Dr. Elwyn's conclusion was based on defendant's "delusional beliefs" regarding, inter alia, the Obamas and the singer and actress Jennifer Lopez being his girlfriend. Defendant had also endorsed auditory and visual hallucinations. According to Dr. Elwyn, defendant "ha[d] no insight into the fact that he ha[d] a mental illness[,] that these [we]re delusional beliefs, [and] that he [wa]s in need of medication."

6

At Atascadero, defendant had refused to take his prescribed antipsychotic medication. Dr. Elwyn explained that defendant suffered direct physical harm as a result of his schizophrenia, including declining medically recommended hernia surgery and licking the tip of his catheter, which caused an infection. If left untreated, defendant's mental illness posed a threat of harm to his mental health.

Defendant addressed the trial court, stating that he did not need medication, that he was "perfectly fine[,]" and that he needed help resolving the case so that he could "go about [his] way and . . . keep fighting."

The trial court found that defendant "lack[ed] the capacity to make his decision regarding psychotic medication and if his mental disorder [wa]s not treated, it would cause physical harm or mental harm to [defendant]." The court issued an order authorizing the involuntary administration of antipsychotic medication to defendant.

### 6. *Restoration to competency*

In a February 28, 2019, report to the trial court, staff at Atascadero recommended that defendant "be returned to court as competent to stand trial . . . ." At that time, defendant's "[t]hought process was linear, logical and goal-directed." He continued, however, to "express grandiose claims" about knowing President Obama and Jennifer Lopez and had poor insight into his mental illness. Defendant's "symptoms [were] effectively managed by his current medication." Regarding his criminal case, defendant "ha[d] a solid understanding of his charge, consequences of prior convictions, and criminal proceedings against him." (Bolding omitted.) Defendant had "attempted to conceal or 'cheek' his medication in the past"; therefore the report

7

recommended that his medication "be given exactly as prescribed . . . to avoid decompensation."

On March 4, 2019, Atascadero's medical director certified that defendant was presently competent to stand trial. In an accompanying letter, the medical director stated: "[Defendant] is being returned to court on psychotropic medication. It is important that [defendant] remain on this medication for his own personal benefit and to enable him to be certified under Section 1372 of the Penal Code."

On March 15, 2019, the trial court found that defendant had been restored to competency and reinstated criminal proceedings.

7. *Defendant's request to represent himself*

On June 20, 2019, defendant again indicated that he wanted to represent himself. The trial court held a hearing on defendant's request on June 27, 2019.

At the hearing, the trial court informed defendant of the risks and disadvantages of self-representation, but defendant maintained his request. The court found that defendant had voluntarily, intelligently, and unequivocally waived his right to counsel. Defendant asked if he "could have a regular attorney to guide [him]" given that it was "a life case." This concerned the court, which explained that it was not its normal practice to appoint "co-counsel" for a self-represented defendant. The court indicated its willingness to allow defendant to withdraw his request to represent himself. After the court elaborated on the disadvantages, defendant still elected self-representation.

8. *The prosecutor's pretrial concerns*

i. <u>July 8, 2019, hearing</u>

On July 8, 2019, defendant indicated that he was ready for trial, that he had reviewed any and all relevant reports and evidence that could be used against him, and that he did not have any witnesses.

The prosecutor then noted that defendant's statement that he did not have any witnesses conflicted with his earlier representations. The prosecutor expressed concern that defendant was "not able to conduct his own defense in a rational manner." According to the prosecutor, defendant had stated that he was not on any medication. The prosecutor noted that the evaluations from Atascadero had stated the importance of defendant remaining on medication to maintain his competency.

When asked by the trial court, defendant confirmed that he had not been taking medication in the lead-up to trial. The court asked defendant if his doctors had told him that he no longer needed to take the medication or if he had "decided on [his] own[.]" Defendant responded, "They told me I didn't need to take it. They took me off of it."

The following colloquy ensued:

"THE COURT: I'm going to ask you some really basic questions. I don't mean to be disrespectful to you. I need to make some considerations. . . . [¶] Do you know what I am, like what my title is?

"THE DEFENDANT: Yes. You are a judge.

"THE COURT: Do you understand what my role in this process is?

"THE DEFENDANT: Yes.

"THE COURT: Use your own words. What is my job?

9

"THE DEFENDANT: Your job is to either find me not guilty or guilty.

"THE COURT: That would be if you waived your right to a jury trial. [¶] Do you understand you have a right to a jury trial?

"THE DEFENDANT: Yes, I do.

"THE COURT: Are you asking to give up that right or would you still be exercising your right to have a jury trial?

"THE DEFENDANT: No. I would like a jury trial.

"THE COURT: So understanding that the jury would be the finders of fact, they would be the ones determining whether or not you're guilty or not based on the evidence, what, then, would you see my role as the judge?

"THE DEFENDANT: Well, to hand down the sentence or set me free.

"THE COURT: That is part of my job. [¶] During the trial what do you think I would be doing?

"THE DEFENDANT: You would be basically objecting and sustaining or overruling what me and her have to say.

"THE COURT: Do you understand what Ms. Marshall's role is in this trial?

"THE DEFENDANT: Yeah. She's the prosecutor.

"THE COURT: As the prosecutor . . . what is her role?

"THE DEFENDANT: She needs to prove that I'm guilty.

"THE COURT: Do you understand the burden of proof as far as how much—like how high she has to prove it, beyond what level?

"THE DEFENDANT: No, I'm not sure about that.

"THE COURT: Have you ever heard the phrase beyond a reasonable doubt?

"THE DEFENDANT: Yeah. Okay. Yes."

After the prosecutor stated that there was nothing else that she wanted to add to the record, the trial court announced that it had not found anything indicating or suggesting that defendant was incompetent. The court explained:

"He seems to understand the role of the judge and the jury. He may not articulate it as well as perhaps somebody who is experienced in these matters, as a professional attorney or member of the court staff or myself, but I think he did explain the different roles [of] the main players . . . .

"He's indicated that the doctors have discontinued medication. I have nothing to suggest, other than the representations that the report indicated he needed to stay on medication, but he's not showing any decompensation as a result of perhaps not being on medication at this time.

"Additionally, he has indicated that he understands he has an obligation potentially to provide you information as far as evidence that he might want to present in his own defense. He also has indicated that he thought he might need some doctors to testify or some witnesses to testify on his own behalf, but he believes, upon further evaluation and analysis, he does not need those. He believes he has alternative evidence that may be able to establish the facts that he wants to establish by way of that evidence, and so I do not find that it would be appropriate to terminate [defendant's] self-representation."

The trial court recognized "that somebody who may be competent to stand trial may not be competent to represent themsel[f]." The court, however, concluded that there were not "sufficient grounds to terminate" defendant's right to self-representation.

11

## ii. July 9, 2019, hearing

The following day, on July 9, 2019, the case was transferred to a different courtroom for trial. Defendant indicated that he was ready for trial and that he might call two witnesses. The prosecutor noted that defendant had not subpoenaed any witnesses. The court responded, "Well, then, he won't be calling them as witnesses if he hasn't subpoenaed them." Defendant stated that he had not received "paperwork from the law library to subpoena them" because he was in the prison's administrative segregation. The court informed defendant that he was required to disclose the names of his witnesses to the prosecutor and reminded him that he had stated that he was ready for trial. Defendant responded, "Yeah. Okay. I'm ready. Let's go to trial. I can do it."

The prosecutor told the trial court: "[Y]esterday I brought . . . a motion saying I don't believe the defendant is competent to represent himself . . . ." She further explained, "I would have concerns with the defendant representing himself if he can't even figure out [how] to subpoena the witness."

Defendant insisted that he could defend himself by telling the truth and questioning Officer Juan "to catch him in a lie."

The trial court gave defendant the opportunity to subpoena a witness, but it explained that defendant would "have to waive time in order to do that." The court also offered to appoint an investigator to assist defendant with the subpoena. Defendant stated that he would only agree to postpone trial for a maximum of 10 days. When the court indicated that would be impossible, defendant reiterated that he did not want to waive time to present his defense.

The prosecutor stated that she did not think that defendant was prepared and that it was "a very bad choice" for him to represent himself. She further commented that the trial court could, "perhaps, . . . find he's not competent to represent himself, but . . . he appears to understand what's going on and just doesn't want to waive." Asked by the court if that was the case, defendant responded, "Yeah. I'm ready to go forward."

9. *Defendant's trial conduct*

On July 10, 2019, prior to jury selection, the trial court renewed its offer to appoint an investigator for defendant and to allow defendant time to subpoena witnesses. Defendant was unwilling to accept that offer and indicated that he was prepared to go forward. Shortly thereafter, defendant made comments about "running from this state here and Google Earth" and that he had "let Mr. Trump know a couple of things and he was satisfied with that."

On the first day of trial, defendant cross-examined Officer Juan. Defendant questioned him regarding the purpose of entering defendant's cell on June 23, 2017, the details of the battery, and Officer Juan's incident report.

The following morning, on July 11, 2019, defendant refused to come to court from the detention facility and was ordered to be brought "with reasonable and necessary force[.]" The prosecutor informed the trial court that when she had attempted to give defendant oral discovery, defendant had cursed at her and would not allow her to provide the discovery.

After a physician's assistant testified on direct-examination about Officer Juan's injuries, the trial court asked defendant if he had any questions for the witness. Defendant did not respond and the court noted that defendant had "raised his right hand

13

and extended his middle finger." Later, when asked by the court if defendant wished to make a statement to the jury, defendant refused to answer and again raised his middle finger. After the prosecution rested and the court asked if defendant wished to present any evidence, defendant twice raised his middle finger, which the court interpreted "as a no."

At the start of the afternoon session on July 11, 2019, the trial court inquired whether defendant wished to present any special instructions to the jury. Defendant raised his middle finger and stated, "These are my special instructions right here." When the court repeated the request, defendant stated, "A faggot gets the finger[.]" The court noted that on several occasions during the morning session, defendant had extended his middle finger to the judge, the jury, or witnesses.

The trial court noted that defendant had been placed in physical restraints that morning and set forth the reasons on the record by questioning two officers from the detention facility. According to one officer, defendant had refused to dress and come out of his cell that morning. Defendant had said, multiple times, "'Eat a dog's dick and die.'" Another officer had witnessed defendant screaming at the prosecutor as she was trying to give him discovery, telling her to "'[d]iscover her own ass[.]'"

The trial court later asked defendant if he wanted the jury to consider any lesser-related offenses. Defendant stated, "I'm asking for the jury to get back. Or send me back so I can get some Zs." When the court asked again, defendant responded, "No. I want to be—on a rig. I want to get out of here. I haven't committed a crime."

On the third and final day of trial—July 15, 2019— defendant presented his closing argument, during which he asked

the jury to disregard his past because he was "a redeemed individual." He argued that Officer Juan had caused his broken nose himself. The trial court repeatedly admonished defendant that he could not bring up new evidence. Defendant concluded by stating, "I guess I'll leave it to Almighty to decide."

After the verdict was announced, the trial court asked defendant if he wanted to poll the jury. Defendant responded, "No, Judge. Actually, I haven't been on my meds . . . [.]" After the jury exited the courtroom, defendant told the court, "I've been hearing voices throughout this whole trial and I've got, like, somebody talking to me in the cell and it tells me to represent myself and I was supposed to be on meds and they haven't given me my meds so I am stating that I'm incompetent." The court set the matter for sentencing.

10. *Appointment of counsel*

Prior to sentencing, defendant requested and was appointed counsel.

11. *Motion for a new trial*

On November 25, 2019, defendant, represented by counsel, filed a motion for "a new trial on the ground of legal error in permitting defendant to represent himself." The People opposed the motion.

On March 18, 2020, after entertaining oral argument, the trial court denied defendant's motion for a new trial. The court explained, "This Court did not see any indication of severe mental illness to the point where the defendant could not carry out the basic tasks needed to present a defense. [¶] What the Court did see [are] the very common mistakes almost all pro per defendants make of being unfamiliar with the code, unable to properly pick a jury, or properly admit evidence. [¶] Due to this the defendant

15

would become frustrated or nonresponsive or make unsolicited statements. [¶] His cursing or disruptive actions or bizarre answers to questions or statements taken in isolation or overall in this particular trial was not substantial evidence of mental incompetence." Thus, the court concluded that it "did not err[] in permitting the defendant to represent himself[.]"

B. Relevant law

1. *Competency to stand trial*

The trial of an incompetent defendant violates the due process clauses of both the United States and California Constitutions. (*People v. Nelson* (2016) 1 Cal.5th 513, 559.) "A defendant is incompetent to stand trial if the defendant lacks ""sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him."" [Citations.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 195 (*Mickel*).)

A trial court is required "to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 847; see also § 1368.)[5]

---

[5]    Section 1368, subdivision (a), provides: "If, during the pendency of an action and prior to judgment, . . . a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as

16

"[G]enerally speaking, when a defendant has already been found competent to stand trial, 'a trial court need not suspend proceedings to conduct a second competency hearing unless it "is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding.' [Citation.]" (*People v. Rodas* (2018) 6 Cal.5th 219, 234 (*Rodas*); see also *People v. Jones* (1991) 53 Cal.3d 1115, 1153.) And, "when a competency hearing has already been held, 'the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state,' particularly if the defendant has 'actively participated in the trial' and the trial court has had the opportunity to observe and converse with the defendant. [Citation.] [¶] This rule does not, however, alter or displace the basic constitutional requirement of *Pate*[ *v. Robinson* (1966) 383 U.S. 375, 385–386] and *People v. Pennington*[ (1967) 66 Cal.2d 508, 518], which require the court to suspend criminal proceedings and conduct a competence hearing upon receipt of substantial evidence of incompetence even if other information points toward competence." (*Rodas*, *supra*, at p. 234.)

"We review a trial court's determination concerning whether a new competency hearing must be held for substantial evidence. [Citation.]" (*People v. Ng* (2022) 13 Cal.5th 448, 531.)

2. *Competency to exercise right to self-representation*

The United States Constitution guarantees a criminal defendant the "right to proceed without counsel when he voluntarily and intelligently elects to do so." (*Faretta v.*

---

long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time."

*California* (1975) 422 U.S. 806, 807.)  That right, however, is not absolute.  (*Indiana v. Edwards* (2008) 554 U.S. 164, 171 (*Edwards*).)  A state may "insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."  (*Id.* at p. 178.)

Our Supreme Court has held that California "trial courts may deny self-representation in those cases where *Edwards* permits such denial."  (*People v. Johnson* (2012) 53 Cal.4th 519, 528.)  Still, "[s]elf-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly.  A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides."  (*Id.* at p. 531.)

"A trial court's determination regarding the defendant's competence to represent himself is reviewed for substantial evidence."  (*People v. Orosco* (2022) 82 Cal.App.5th 348, 358.)

C.  Analysis

1.  *Failure to conduct new competency hearing*

Defendant asserts that the trial court erred by failing to declare a doubt as to defendant's competence, suspend proceedings, and conduct a new competency hearing once it became aware that defendant had stopped taking his medication and "started displaying signs of incompetence similar to those he exhibited during the time he was incompetent[.]"  We conclude otherwise.

When the prosecutor expressed concern on July 8, 2019, that defendant was "not able to conduct his own defense in a rational manner" and was no longer taking medication, the trial

18

court took the reasonable and appropriate step of questioning defendant about the medication and defendant's understanding of the court proceedings.  Nothing in defendant's response to this questioning, or in his subsequent conduct at trial, presented the court with substantially changed circumstances or new evidence that cast a serious doubt as to the validity of its prior competence finding.

When asked by the trial court, defendant confirmed that he was no longer taking his medication but stated that his doctors had taken him off of it because he no longer needed it.  Defendant now contends that his representation to the court "obviously cannot be trusted, and should not have been trusted."  But it is not impossible or inherently implausible that a doctor might discontinue prescribed medication such that the court was required to disbelieve defendant.  (See *State Farm Fire & Casualty Co. v. Jioras* (1994) 24 Cal.App.4th 1619, 1626, fn. 5 ["an appellate court . . . may not reject evidence as lacking credibility unless it is physically impossible [citations] or inherently implausible [citation]"].)  And, regardless of whether defendant made the unilateral decision to stop taking medication or was following professional advice, the court found that defendant was "not showing any decompensation as a result . . . ."  Having questioned and observed defendant, the trial court was in the best position to make this determination (*Mai*, *supra*, 57 Cal.4th at p. 1033 ["the trial court is in the best position to observe the defendant during trial"]), and could "'appropriately take its personal observations into account in determining whether there ha[d] been some significant change in . . . defendant's mental state'" (*Rodas*, *supra*, 6 Cal.5th at p. 234).

Defendant argues that, as the trial progressed, he "grew increasingly hostile and withdrawn and showed signs of decompensation." It is certainly true that defendant used profanity in the courtroom, made obscene hand gestures, uttered occasional bizarre comments, and was uncooperative at times. "However, once a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry. [Citation.]" (*People v. Marks* (2003) 31 Cal.4th 197, 220.)[6] "An uncooperative defendant is not tantamount to an incompetent one." (*People v. Parker* (2022) 13 Cal.5th 1, 29.) Nor is "disruptive behavior . . . substantial evidence of incompetence unless, by its particular nature, it casts doubt on the defendant's ability to assist in his or her defense. [Citations.]" (*Mai, supra,* 57 Cal.4th at p. 1034.) Here, defendant demonstrated an adequate understanding of the criminal proceedings, cross-examined a witness, made opening and closing statements, and advanced a seemingly plausible defense.

---

[6] It is well-settled that mere bizarre statements or actions do not by themselves require a trial court to hold a competency hearing. (See *Mickel, supra,* 2 Cal.5th at p. 202; *People v. Laudermilk* (1967) 67 Cal.2d 272, 285.) By way of example, the California Supreme Court recently concluded that a criminal defendant's "odd behaviors"—including "calling [a] mental health expert . . . 'a Christian spy'; suggesting there were poisoned ants on cookies provided by the jail; referring to [d]efense [c]o-counsel . . . as the 'consigliere of the principality of Israel,' the last phrase (the principality of Israel) seemingly referring to himself; referring to [the] [p]rosecutor . . . as 'one of [his] subjects'; and calling [the trial judge] the 'lady of the court[]'"—did not require the trial court to raise a doubt as to the defendant's competency under section 1368. (*People v. Bloom* (2022) 12 Cal.5th 1008, 1032.)

We also find that the two cases upon which defendant relies heavily—*Rodas*, *supra*, 6 Cal.5th 219 and *People v. Murdoch* (2011) 194 Cal.App.4th 230 (*Murdoch*)—do not compel reversal, as they are distinguishable in significant ways.

In *Rodas*, the defendant was found incompetent to stand trial and was confined to a state hospital, where he was treated with antipsychotic medication. (*Rodas*, *supra*, 6 Cal.5th at p. 223.) "After several months of treatment with antipsychotic medication, hospital physicians reported that [the] defendant had regained trial competence, but cautioned that it was important for [the] defendant to continue taking his medication. At the start of his jury trial some months later, however, the trial court learned that [the] defendant had stopped taking his medication and that he had begun communicating incoherently with counsel about defense strategy, exhibiting some of the same symptoms he had displayed during earlier episodes of incompetence. Defense counsel declared a doubt about [the] defendant's competence, but the trial court ruled that the trial could proceed after conducting a brief colloquy with [the] defendant in which [the] defendant was able to identify the charges against him and stated a willingness to go to trial and work with counsel." (*Ibid.*)

The California Supreme Court reversed, holding: "As a general rule, once a defendant has been found competent to stand trial, a trial court may rely on that finding absent a substantial change of circumstances. But when a formerly incompetent defendant has been restored to competence solely or primarily through administration of medication, evidence that the defendant is no longer taking his medication and is again exhibiting signs of incompetence will generally establish such a change in circumstances and will call for additional, formal

investigation before trial may proceed.  In the face of such evidence, a trial court's failure to suspend proceedings violates the constitutional guarantee of due process in criminal trials. [Citation.]"  (*Rodas, supra,* 6 Cal.5th at p. 223.)

While the facts of *Rodas* are similar to those of the instant case in several respects, critical differences exist.  In both cases, a prior competence finding was "effectively conditioned" on taking antipsychotic medication.  (*Rodas, supra,* 6 Cal.5th at p. 235; see also *id.* at p. 238.)  But here, defendant represented to the trial court that his medication had been discontinued by his doctors, which the court was entitled to believe.  No such representation was made in *Rodas.*  And, in *Rodas,* the trial court was confronted with substantial evidence that the defendant was exhibiting signs of incompetence that directly related to his ability to assist in his defense.  Defense counsel informed the trial court that her client was communicating in an incoherent manner; he was using the same type of "'word salad'" that he had used when he had previously been deemed incompetent.  (*Id.* at p. 227.)  Defense counsel had difficulty understanding what her client was saying and wanted.  (*Ibid.*)  Unlike here, the trial court in *Rodas* was aware of facts "rais[ing] a reasonable doubt as to whether [the] defendant was able to communicate *rationally* with his attorney and thus 'to assist counsel in the conduct of a defense in a *rational* manner.'"  (*Id.* at p. 233, italics added.)

In *Murdoch,* doctors appointed to examine the defendant pursuant to section 1368 concluded that he was presently competent, but they expressed concern that he had subsequently refused to take his prescribed medication and could, as a result, become incompetent.  (*Murdoch, supra,* 194 Cal.App.4th at pp. 232–233.)  The trial court found that the defendant was not

22

incompetent. (*Ibid.*) About two months later, the defendant was permitted to represent himself at trial. (*Id.* at pp. 233–234.) Prior to opening statements, the defendant informed the trial court that his defense was that the alleged victim was not a human being. To prove this, he wanted to introduce pages from the Bible and demonstrate that the victim did not have shoulder blades, which he believed were "'symbolic of angelic beings.'" (*Id.* at p. 234.) The sole question he asked of a witness was whether the victim could shrug his shoulders. (*Id.* at p. 235.)

The Court of Appeal held that the defendant's bizarre statements, "taken together" with the expert reports (*Murdoch*, *supra*, 194 Cal.App.4th at p. 238) detailing the "defendant's fragile competence and its evident dependence upon continued medication" (*id.* at p. 237), "provide[d] the substantial evidence necessary to demonstrate a reasonable doubt as to whether he had in fact decompensated and become incompetent as the experts had warned" (*id.* at p. 238).

In both *Rodas* and *Murdoch*, "the defendants' behavior, in combination with the warnings of the health professionals about the likelihood that they would become incompetent if they did not take antipsychotic medication, was substantial evidence giving rise to a doubt as to their competence." (*Rodas, supra*, 6 Cal.5th at p. 236.) Here, the trial court was aware that defendant was no longer taking his medication, but the court was not confronted with statements and behavior indicating that defendant could not rationally contribute to his defense. Defendant did not speak in "'word salad'" (*id.* at p. 227) or advance a delusional defense such as that the victim was not human (*Murdoch, supra*, 194 Cal.App.4th at p. 234). Defendant contends that his refusal to delay proceedings in order to subpoena witnesses was

23

irrational in light of the sentence he was facing if convicted. While arguably unwise, we decline to find that asserting his right to a speedy trial and declining to waive time when he believed that he could mount his defense in other ways was substantial evidence of incompetence.[7]

Having carefully reviewed the record, we conclude that substantial evidence supports the trial court's decision not to hold a new competency hearing. Given the lack of substantially changed circumstances or new evidence casting serious doubt on the validity of its prior competence finding, the court could continue to rely on it.

2. *Self-representation at the July 8, 2019, hearing*

Defendant also claims that, under *People v. Lightsey* (2012) 54 Cal.4th 668 (*Lightsey*), the trial court committed reversible error by allowing defendant to represent himself at the July 8, 2019, hearing after the prosecutor informed the court that defendant was no longer taking his medication and questioned his competence to represent himself.

In *Lightsey*, the California Supreme Court held that it was reversible error for a trial court to permit a "defendant to represent himself during the competency proceedings following the trial court's . . . declaration of doubt under section 1368."

---

[7]     In his reply brief, defendant likens his case to *In re Sims* (2021) 67 Cal.App.5th 762 (*Sims*), where "even to a casual observer, the manner in which [the] defendant conducted her defense was not rational. [Citation.]" (*Id*. at p. 778.) This included arguing that her husband, who she was accused of killing, had actually been alive when the coroner took photographs. (*Id*. at p. 769.) Albeit ultimately unsuccessful, we cannot say that defendant conducted his defense in a similarly irrational way.

24

(*Lightsey*, *supra*, 54 Cal.4th at p. 690.)  The Supreme Court pointed to the language of section 1368, which requires the appointment of counsel under such circumstances.  (*Lightsey*, *supra*, at p. 692 ["The plain language of section 1368 . . . provides that when the trial court states on the record that a doubt exists concerning the defendant's mental competence, '[i]f the defendant is not represented by counsel, the court shall appoint counsel[]'" (italics omitted)].)  The Supreme Court concluded that the defendant's statutory rights had been violated, but it declined to decide whether his constitutional rights were also violated.  (*Id.* at pp. 698–699.)

    *Lightsey* does not compel reversal here, where the trial court did not declare a doubt concerning defendant's competency, suspend trial proceedings, and initiate formal competency proceedings.[8]  Section 1368's requirement that counsel be appointed upon the trial court's declaration of doubt simply was not triggered, and we find no error in allowing defendant to represent himself at the July 8, 2019, hearing.

---

[8]    Defendant's reliance on *People v. Tracy* (1970) 12 Cal.App.3d 94 (*Tracy*) is equally misplaced.  In *Tracy*, the trial court permitted the defendant to discharge his attorney and represent himself in the midst of section 1368 competency proceedings.  (*Tracy*, *supra*, at pp. 99–101.)  The Court of Appeal reversed, concluding:  "When a doubt has arisen as to a defendant's sanity, and that fact has been judicially declared, we think it equally contradictory, inconsistent and incongruous to permit him to discharge his attorney and represent himself at the hearing where the issue of his sanity is to be determined."  (*Id.* at p. 102.)  Here, in contrast, doubt regarding defendant's competence was not "judicially declared" (*ibid.*) at the July 8, 2019, hearing.

### 3. *Self-representation at trial*

Finally, defendant contends that he was incompetent to represent himself at trial. Quoting *People v. Burnett* (1987) 188 Cal.App.3d 1314, 1327, defendant argues that he lacked "'an appreciation of the . . . nature of possible penalties . . . [or] his own physical or mental infirmities' and was unable to 'use relevant information rationally in order to fashion a response to the charges; [or] coherently communicate that response to the trier of fact.'"

We disagree. Defendant expressed his understanding that he was facing a life sentence when he sought to represent himself. He participated in voir dire and used a peremptory challenge to excuse a juror who worked for the California Department of Corrections and Rehabilitation as a correctional officer because "the case has to do with being in the CDC[R]." During argument and the cross-examination of Officer Juan, defendant consistently advanced his theory that the victim had lied about the way the assault had occurred. Defendant did not subpoena and call his own witnesses, but this was not due to incapacity. Rather, defendant made the decision to prioritize a speedy trial over accepting the assistance offered by the trial court.

The trial record reflects that defendant "was capable of performing the basic tasks of self-representation without the assistance of counsel." (*People v. Miranda* (2015) 236 Cal.App.4th 978, 989 (*Miranda*).) In denying defendant's motion for a new trial, the trial court explained that it "did not see any indication of severe mental illness to the point where the defendant could not carry out the basic tasks needed to present a defense." Instead, the court saw common mistakes made by

"almost all" individuals representing themselves, which caused defendant to become "frustrated or nonresponsive or make unsolicited statements."

Defendant may have been "inarticulate and ineffective[,]" but "that is no doubt the norm in many self-represented cases, not the exception." (*Miranda, supra*, 236 Cal.App.4th at p. 989.) His deficiencies at trial do not appear to be the result of mental incompetence but rather choice, inexperience, frustration, or anger. The trial court did not err by permitting defendant to represent himself.

II. *Prior Out-of-State Convictions*

Defendant argues, and the People concede, that there was insufficient evidence to support the trial court's finding that the five prior out-of-state convictions qualified as serious felonies within the meaning of the Three Strikes law or the section 667, subdivision (a) enhancement.

A. Background

The information alleged that defendant had previously suffered the following out-of-state convictions, which qualified as serious felonies within the meaning of the both the Three Strikes law and the section 667, subdivision (a) enhancement because they included all elements of California's crime of robbery: (1) a December 8, 1999, conviction in Florida; (2) an August 8, 2001, conviction in Florida; (3) an April 9, 2003, conviction in Florida; (4) a September 30, 1988, conviction in Illinois; and (5) another September 30, 1988, conviction in Illinois. The information did not identify any Florida or Illinois statutes in relation to the alleged prior convictions.

At trial, the People introduced several exhibits to prove the prior convictions. These included certified printouts from the

California Law Enforcement Telecommunications System (CLETS) reflecting defendant's criminal history in Florida and Illinois and various court documents from those states.

On July 15, 2019, the trial court stated that it had reviewed the People's exhibits and had "determined that the defendant is the person named therein and that the out-of-state prior convictions adhere to the elements of the corresponding California crime." The court further noted that it was incumbent on the jury "to determine if the defendant suffered these prior convictions based on the exhibits presented."

B. <u>Relevant law</u>

"'Various sentencing statutes in California provide for longer prison sentences if the defendant has suffered one or more prior convictions of specified types.' [Citation.] A prominent example is a conviction of a 'serious felony' as defined in . . . section 1192.7, subdivision (c)." (*People v. Avery* (2002) 27 Cal.4th 49, 53 (*Avery*).) As relevant here, serious felonies include robbery (§ 1192.7, subd. (c)(19)), attempted robbery (§ 1192.7, subds. (c)(19) & (39)), "any felony in which the defendant personally uses a firearm" (§ 1192.7, subd. (c)(8)), and "any felony in which the defendant personally used a dangerous or deadly weapon" (§ 1192.7, subd. (c)(23)).

"Conviction of a serious felony has substantial sentencing implications under the 'Three Strikes' law [citation] and also under section 667, subdivision (a)(1), which mandates a five-year sentence enhancement for each such conviction." (*Avery, supra*, 27 Cal.4th at p. 53.)[9]

---

[9] Under the Three Strikes law, prior convictions for "violent felony offenses" are also subject to increased punishment. (§ 667, subd. (b); see also § 667.5, subd. (c) [defining violent felony].)

"To qualify as a serious felony, a conviction from another jurisdiction must involve conduct that would qualify as a serious felony in California." (*Avery*, *supra*, 27 Cal.4th at p. 53.) However, "if the foreign law can be violated in different ways, and "'the record does not disclose any of the facts of the offense actually committed, the court will presume that the prior conviction was for the least offense punishable under the foreign law." [Citation.]' [Citations.]" (*People v. Denard* (2015) 242 Cal.App.4th 1012, 1024 (*Denard*).)

"[T]he [trial] court's factfinding role regarding prior convictions [is] . . . 'limited to identifying those facts that were established by virtue of the [prior] conviction itself—that is, facts the jury was necessarily required to find to render a guilty verdict, or that the defendant admitted as the factual basis for a guilty plea.' [Citations.]" (*In re Milton* (2022) 13 Cal.5th 893, 903 (*Milton*); see also *People v. Gallardo* (2017) 4 Cal.5th 120, 136.)

We review for substantial evidence a trial court's finding that a prior out-of-state conviction is a serious felony under California law. (See *People v. Delgado* (2008) 43 Cal.4th 1059, 1067; *Denard, supra*, 242 Cal.App.4th at pp. 1023–1026.)

C. <u>Analysis</u>

We agree with the parties that the evidence was insufficient to support the trial court's finding that the five prior

---

There is some overlap between the definitions of serious and violent felonies. (See §§ 667, subd. (c), 1192.7, subd. (c).) For example, "robbery is both a serious and violent felony offense. (§§ 667.5, subd. (c)(9), 1192.7, subd. (c)(19).)" (*People v. Montalvo* (2019) 36 Cal.App.5th 597, 624.) The information, however, only alleged that the five prior out-of-state convictions were serious felonies—not violent felonies—within the meaning of the Three Strikes law.

out-of-state convictions—three from Florida and two from Illinois—qualified as serious felonies within the meaning of the Three Strikes law or section 667, subdivision (a).

### 1. *The 1999 and 2003 Florida convictions*

The exhibits introduced at trial by the People reflect that defendant was convicted in Florida of attempted robbery (Fla. Stat., §§ 812.13(2)(c), 777.04) following a plea of nolo contendere in 1999 and of robbery (Fla. Stat., §§ 812.13(2)(c)) following a guilty plea in 2003.

In Florida, robbery is defined as "the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to *either permanently or temporarily* deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear." (Fla. Stat. § 812.13(1), italics added.) Thus, under Florida law, a robbery can be committed with the intent to only temporarily deprive a victim of property.[10] In contrast, "[t]he California offense of robbery (§ 211) . . . is a specific intent crime that requires "'the intent to *permanently* deprive the person of the property.'" [Citation.]" (*Milton, supra,* 13 Cal.5th at p. 900, italics added.)

Defendant could have been convicted of robbery or attempted robbery in Florida for conduct that would not have constituted a robbery or attempted robbery in California. (See

---

[10] "Theoretically, [a Florida] jury could find that the slapping of the cell phone from the victim's hand or the rummaging through the victim's purse technically constituted a taking [as required to prove robbery] under the theory that it temporarily deprived the victim of her property." (*Thermidor v. State of Florida* (Fla. Dist. Ct. App. 2014) 146 So.3d 95, 97, fn. 1.)

*Milton*, *supra*, 13 Cal.5th at p. 900.)  Nothing before the trial court demonstrated that defendant committed the Florida offenses with the intent to permanently—as opposed to temporarily—deprive the victims of property.

### 2. *The 2001 Florida conviction*

The record indicates that defendant was convicted in Florida of armed robbery (Fla. Stat., § 812.13(2)(b), 775.087) following a plea of guilty in 2001.  According to the charging document, defendant "carried a deadly weapon, to wit: metal bar and/or fire extinguisher" (capitalization omitted) during the commission of the robbery.

As discussed above, the fact that defendant was convicted of robbery in Florida, by itself, does not provide sufficient evidence that the conviction qualifies as a serious felony.  Nor does the fact that defendant was convicted of armed robbery in Florida provide sufficient evidence that he was convicted of a "felony in which the defendant personally *used* a dangerous or deadly weapon" (§ 1192.7, subd. (c)(23), italics added) that would qualify as a serious felony.  That is because, under Florida law, "the statutory element which enhances punishment for armed robbery is not the *use* of the deadly weapon, but the mere fact that a deadly weapon was *carried* by the perpetrator.  The victim may never even be aware that a robber is armed, so long as the perpetrator has the weapon in his possession during the offense." (*State v. Baker* (Fla. 1984) 452 So.2d 927, 929.)

### 3. *The 1988 Illinois convictions*

The CLETS printout of defendant's Illinois criminal history indicates that, in 1988, defendant was convicted of armed robbery (720 Ill. Comp. Stat. 5/18-2(a)) and "ARMED ROBBERY/DISCH F/ARM/HARM" (720 Ill. Comp. Stat. 5/18-2(a)(4)) in that state.

Robbery in California "is a specific intent crime that requires "'the intent to permanently deprive the person of the property.'" [Citation.] Illinois robberies are general intent crimes, and the definitions of robbery and armed robbery in Illinois do not include this specific intent element. [Citations.]" (*Milton*, *supra*, 13 Cal.5th at p. 900; see also *People v. Jamison* (Ill. 2001) 756 N.E.2d 788, 801 [in Illinois, "armed robbery is a general intent crime"].) Thus, "the Illinois robbery statutes do not contain all the elements of California's robbery statute[.]" (*Milton*, *supra*, at p. 900.)

The version of the Illinois robbery statute in effect when defendant was convicted provided, in relevant part: "A person commits armed robbery when he or she violates [the Illinois robbery statute] while he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon." (Ill. Stat. 1988, ch. 38, par. 18-2(a).) Thus, defendant could have been convicted of armed robbery in Illinois if he merely carried a dangerous weapon during the course of the robbery. This would not constitute a "felony in which the defendant personally used a dangerous or deadly weapon" and, thus, a serious felony in California. (§ 1192.7, subd. (c)(23).)

Finally, the CLETS printout indicates that defendant suffered a conviction under subdivision (a)(4) of the Illinois armed robbery statute (720 Ill. Comp. Stat. 5/18-2(a)(4)). That subdivision provides that a person who violates the Illinois robbery statute commits armed robbery when "he or she, during the commission of the offense, personally discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person." (720 Ill. Comp. Stat. 5/18-2(a)(4).) A conviction under this subdivision

would appear to qualify as a serious felony in California as either a "felony in which the defendant personally uses a firearm" (§ 1192.7, subd. (c)(8)) or a "felony in which the defendant personally used a dangerous or deadly weapon" (§ 1192.7, subd. (c)(23)). But, as defendant correctly observes, it is impossible that he suffered a conviction in 1988 under subdivision (a)(4) of the Illinois armed robbery statute because that subdivision did not exist until 2000. (*People v. Garcia* (Ill. 2002) 770 N.E.2d 208, 210 (conc. opn. of Harrison, C. J.).)

### 4. *Remedy*

Based on the foregoing, there is a lack of substantial evidence that any of the five prior out-of-state convictions qualifies as a serious felony for the purpose of the Three Strikes law or the section 667, subdivision (a) enhancement. The true findings on the strikes and section 667, subdivision (a) enhancements must be reversed.

On remand, the people may retry the strike and section 667, subdivision (a) enhancement allegations. (*People v. Strike* (2020) 45 Cal.App.5th 143, 154 ["reversal of a true finding on a prior conviction allegation does not prevent retrial of that enhancement"]; *People v. Cortez* (1999) 73 Cal.App.4th 276, 284, fn. 7 ["There is no double jeopardy bar to a retrial on a prior conviction allegation in a noncapital sentencing proceeding"].)

33

## DISPOSITION

The true findings on the strikes and section 667, subdivision (a) enhancements are reversed.  The sentence is vacated, and the case is remanded.  On remand, the People may retry the strike and section 667, subdivision (a) enhancement allegations.  If the People do not retry the allegations, or following a retrial, the trial court shall conduct a full resentencing.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
HOFFSTADT

34